## LEE *v.* LEE.

To authorize a court to reject parol evidence of a contract, it must appear on the record that the witness was speaking of a written contract.

Where there is evidence that there was a written agreement for a sale made, and the parties spoke of it as concluded, and took it away for execution, the court cannot withdraw the case from the jury because from other evidence it would seem that the paper referred to was a memorandum for a will: and strong presumptions in *odium spoliatoris* are to be made against the vendor, where it has been traced to his possession and is not produced.

Where a father purchased tract A. in his own name with the money of the son, and then agreed with him that the amount thus paid should go into tract B., the possession of which was delivered to the son by the father under a contract for a sale, paying a yearly sum to the father for life, and the son gave notice to his tenant of tract A., who then paid rent to the father, and the assessments were respectively changed, and the son continued in possession of tract B. : there is evidence for the jury of a parol sale which is not within the statute of frauds.

IN error from the District Court of Allegheny.

This was an ejectment by William Lee, who held the legal title, against the widow of his son Ralph and another. And the main question was, whether the defendants' evidence was sufficient to authorize them to go to the jury on their allegation of a sale by William to Ralph Lee.

On the trial of the cause before LOWRIE, J., there was a point made, which is sufficiently stated in the commencement of the opinion of this court. It was clear that the grounds of the action of the court did not appear on the bill of exceptions.

The defendants proved (to the court) the admissions of plaintiff that there was a written contract between himself and Ralph Lee, which had been obtained by plaintiff to make a copy, with an intention of returning it. This agreement was one which was made when the plaintiff and his two sons, Ralph and Thomas, were together. It was in writing, but plaintiff did not say that Thomas, who did not accede to it, was present when it was executed.

The defendant was then examined, and said she had seen the paper referred to, but the plaintiff's signature was not on it, but he and Ralph took it to town to have it executed. Search had been made, but the paper could not be found.

The plaintiff was then examined, and denied its existence, and said the paper referred to was the heads of his will, from which his will had been drawn out and executed; that he could not write; this paper was handed to a Mr. Lee, who drew the will and did not return the paper.

Thomas, a son of the plaintiff, stated, he saw the paper on the

table in 1840. His father called it a bargain, and said it was over, and to make Ralph sure. The paper was written, but there were no signatures.

Lee, the scrivener, testified that in 1841 he drew a will for the plaintiff, who handed him a paper called the heads of his will, in the handwriting of his son Ralph. In this the premises in question were devised to his son Ralph, on paying $300 to his sisters; the Bakerstown farm was devised to Thomas, and other property to his other sons. There was nothing in the paper about a payment to plaintiff for life, and the witness returned the paper to the plaintiff with the will.

His honour then said there was not sufficient preliminary proof of the existence, execution, and loss of an agreement, to leave to the jury.

The defendants then proved the admission by plaintiff, that his son Ralph, when he came of age, was about leaving home, but was persuaded by his father to stay with him until he was twenty-five, on a promise of $500. That they had then selected a piece of land (called the Bakerstown farm), which was purchased for Ralph, in connexion with Joseph Lee, Ralph's share coming to $800, and his $500 being invested in that way.

Fearing his son might be injured by bad company, they had agreed the deed might be made in the name of the plaintiff. Ralph resided on this farm for some time, and it was plaintiff's intention he should have that, and his son Thomas the homestead; but, for family reasons, Ralph was induced to move to the homestead—the plaintiff removing to Allegheny town—and pay plaintiff a rent of $50 per annum. He continued there for some years, and plaintiff then, desiring to make a change, made a positive agreement with Ralph that the $500 invested in the Bakerstown farm should be transferred to the homestead; that Ralph should pay him $50 per annum, and plaintiff be discharged from liability to repair. On the plaintiff's death, the land should be Ralph's, paying certain sums to his sisters.

Thomas Lee stated he remembered the bargain in 1840; he saw the paper; his father said he was going to make a will, but this was to make Ralph sure. The $500 was to be taken out of the Bakerstown farm and put into the homestead, for which Ralph was to pay $50 per annum, and have the land at his father's death. Ralph then lived on the homestead, and the plaintiff in Allegheny town. The plaintiff had offered him various articles if he would say this was only a will.

The defendants gave other proof of similar admissions of the existence of a bargain of the same character as those already stated; and they also proved by the vendor of the Bakerstown tract, that the sale was made to Ralph, who wished to have the deed in his own name. The plaintiff paid $1000 down, and Ralph subsequently paid the mortgage for the balance, $350.

The title-papers showed the conveyance was made to Joseph and William Lee, in 1829, and that in 1830, Joseph conveyed his moiety to William, who conveyed that moiety to one Richards, in 1845.

The defendants showed that the Bakerstown farm was assessed to Ralph Lee from 1834 to 1840, and that in 1841, it was assessed to plaintiff. The homestead farm was assessed to Ralph Lee from 1841 to 1843, and in 1844 it was assessed to his widow, the present defendant, they having continued in possession since the alleged agreement for the sale. From 1837 to 1840, and during previous years, the Bakerstown farm was leased by Ralph, and in 1841 the same tenant occupied and paid the rent to the plaintiff for two years, under a notice, by Ralph, that he had nothing more to do with that place.

On these facts, his honour withdrew the defendant's evidence from the jury, and directed a verdict for the plaintiff.

*Oct.* 2. COULTER, J.—The first bill of exceptions is to the order of the court which compelled the defendant to commence his case by exhibiting his written contract. If the defendant in his evidence, or perhaps even by the statement of his attorney, had disclosed that the same contract respecting the land of which he proposed to give parol testimony, was embraced in a written contract, then it would have been out of place to give the parol evidence of its contents, until the existence and loss of the written contract was duly proved. But it does not appear on the paper-book that the witness, who was stopped by the court, alluded to any written contract, nor indeed does it appear that the attorney made any reference to it. As the case stands, therefore, we do not perceive that the court had any sufficient grounds for arresting the counsel in the mode of presenting his case, which he was about to pursue. This point is of no consequence, however, in the determination or consideration of the cause; and I only notice it because the act of Assembly requires an opinion to be expressed on all the points made in the court below.

The next bill of exceptions regards the exclusion by the court

of any parol evidence of the contents of what the defendants alleged to be a written contract for the sale of the premises in question; because, in the opinion of the court, the previous existence and execution of the contract was not proved, and the paper, in the language of the court, was unfinished, and was merely the heads of a will, drawn up for the plaintiff by his son Ralph.  It must be observed, however, that the court had nothing to do, in that initiative proceeding, with the contents or effect of the paper.  The question, in such cases, before the court is, whether *primâ facie* the party has proved that the paper was executed, did exist, and has been lost, and due search made for it.  The court have nothing to do, in the primary inquiry, with its contents or its legal effect; that belongs to the trial in chief, when both parties are heard.  [His honour here stated the evidence of the existence of a contract.]  The plaintiff then interposed testimony to prevent parol evidence of the contents of this writing from being received.  The court heard the testimony of the plaintiff himself.  [His honour here stated the testimony of Lee.]  Whereupon, the court excluded all evidence of the contents of the paper; as to the existence of which, Hart, Hannah, and Thomas Lee testified.  In this, we think the court erred; because there was clear and distinct *primâ facie* proof by Hart, that such an agreement existed.  The plaintiff told him so.  Hannah Lee saw the paper written, and the plaintiff and Ralph took it to town to have it executed, in the winter of 1840; and Thomas Lee says he saw it on the table at the same time; and the old man told him the contents of it.  This affords the strongest kind of corroborating evidence of Hart's testimony, whose character is in no way impeached.

The court say, however, that according to Hannah and Thomas Lee the instrument was inchoate, and rely upon the testimony of the plaintiff that it was the heads of his will.  But there was the testimony of Hart, who said that the plaintiff told him he had entered into a written agreement for the sale of the land with Ralph, and that he had got it from him to have it copied.  The nature of the evidence given to the court by the plaintiff, shows that it was out of place, because there was conflicting testimony, which required to be weighed and balanced.  The credibility of the witnesses was to be adjusted, inasmuch as the evidence of Hart was in direct conflict with that of the plaintiff.  All these things were within the province of the jury.  But the main objection is, that the court determined what were the contents of the paper.  They say it was carried to town and used as the heads of a will, and

they suppose it was never intended for any other purpose.   Now three witnesses say that it was a bargain, an agreement, and none of them heard any mention of the heads of a will.   In addition to this, the paper which plaintiff calls the heads of his will was not used, if indeed it was the same paper, for more than a year after it was drawn up and carried to town, as Hannah Lee says, for the purpose of being executed.   There is in fact no evidence of its being the same paper, but a strong inference flowing from the facts that it was not, inasmuch as it was not used for so great a length of time for that purpose, and from the fact that there was a considerable amount of other real estate, with which Ralph had nothing to do, embraced in that paper.   And as it appears from the evidence that Ralph was the confidential and trusted son, who had clung to the old man when the others had left him, and as the old man could not write, the presumption is natural, that he would get Ralph to write the heads of his will, when he would carry it to a scrivener to have the will drawn.   And the reason for putting the devise to Ralph in the will is quite as obvious, as he had only an agreement, subject no doubt to conditions which rendered the estate subject to encumbrance during the old man's life, and the payment to his daughters after his death.   There is also a striking feature in this heads of a will, made so by the subsequent testimony in the cause, which shows it to have been a different paper.   That is, as the scrivener Lee says, there was no provision for the annual payment of $50 to the old man during his life, because such provision would have been totally unnecessary in the will.   It was in full proof, by an unimpeached witness, that the contract of sale between plaintiff and Ralph of the premises in dispute was in writing, and that he, the plaintiff, had borrowed it from Ralph to have it copied, and would return it.   It would seem that he never did return it, for after diligent search among the papers of deceased, it cannot be found.   The plaintiff alleges that he left it with the scrivener, but the scrivener says he delivered it back.   If the plaintiff had shown even that paper, it might have thrown some light on the subject.   A jury might have inferred from the facts, that as plaintiff destroyed the will after the death of Ralph, for which there was no necessity, he may also have destroyed what was called in the evidence the bargain or agreement.   He had notice to produce it.   He produced nothing but his own oath, that he never made such an agreement.   As the plaintiff did not produce the paper, nor the paper which he alleged was the same, and as the last gleam of evidence traces it to his possession,

under the circumstances of this case, its execution and original existence ought to be presumed. Where a deed or other paper is proved to be destroyed or suppressed, or there is vehement suspicion of its having been done, the presumption in *odium spoliatoris* applies in favour of the party who claims under such paper, though the contents are not proved: Askew *v.* Odenheimer, Bald. 391. If the plaintiff could prove that the witnesses were mistaken, and that the paper was but the heads of a will, no injury would ensue to him; it would only transfer the issue to the jury, whose peculiar province it is to determine the credibility of witnesses and the contents of papers, under the instruction and direction of the court. Before that tribunal the party himself could not be allowed to prove the nature and character of the paper, contrary to the evidence of unimpeached and disinterested witnesses. Its character and effect must depend on its contents, and with these the court has not to deal in the initiative proceeding. We are of opinion that the court erred in rejecting parol evidence of the contents of the written paper, or what was sworn to be an agreement for the sale of the land in dispute.

The defendant then produced a mass of evidence to establish a parol sale by the plaintiff, of the premises in dispute, to Ralph, his son, now deceased, whose widow she is; and also the payment of part of the consideration, and his taking possession under that sale. At the close of which evidence, the counsel for the plaintiff requested the court to charge the jury that the testimony adduced by the defendant, and the facts given in evidence by them, are not sufficient in law to bar the plaintiff from recovering in this action, and that the facts so given in evidence be excluded from the consideration of the jury. Wherefore the counsel for the defendants prayed the court, before adopting that course, to order and direct that the counsel for the plaintiffs should demur, according to the usual practice; and that, unless a demurrer is filed, the defendant's counsel shall be permitted to address the jury, and argue upon the facts of the case. Whereupon, the court refused to direct the counsel for the plaintiffs to demur, and refused also the prayer of the defendant's counsel for permission to address the jury. To which the defendant's counsel excepted; and the court sealed the bill.

The first thought which struck me, when this part of the case was broken, was, that the oath prescribed for jurors, and which, I presume, was duly administered in this case, requires each to swear " that they will well and truly try the issue joined, and a

true verdict give, *according to the evidence*, unless dismissed by the court, or the cause be withdrawn by the parties." In this cause, the evidence having been given to the jury, and the cause not withdrawn by the parties, nor they dismissed by the court, it was their sworn duty to render a verdict according to that evidence, subject to the instructions of the court. It would seem, therefore, that the course adopted by the court was an invasion of the rights of the jury. When the court request the counsel for the party to reduce his whole evidence to writing, and then reject it as insufficient, the coast is clear both for the jury and the party. There is no evidence offered to the jury, and they are free from embarrassment. But here they were required to render a verdict, upon what? The evidence given by one side alone. The defendant's evidence was relevant to the issue, and competent to be considered; and therefore, by the tenor of their oaths, the jury were bound to render a verdict upon it. It is very seldom that a jury will undertake, after a clear, full charge from the court, with proper indications of the duties of each department, to render a verdict contrary to the law, as laid down by the court; and when they do, the remedy, according to our system, is granting a new trial. Even although cases may occur, where inconvenience may be the result, it does not justify a departure from the well-defined practice. If the party who apprehends inconvenience will adopt it, a remedy is at hand, in the demurrer, in cases like the present, or in the mode already indicated, of requiring the opposite party to reduce his evidence to writing, and then moving the court to reject it, or where it is offered by the plaintiff, by motion for a nonsuit. In either case, counsel have a fair field for argument, without a foregone conclusion by the court. And the jury is relieved either by being discharged, or the cause withdrawn by the court, or by no evidence being submitted to them. Another aspect of the case was strongly pressed, to wit: That the ancient rights of the attorney and party were disregarded by refusing his prayer to be allowed to address the jury. I regard the rights of the attorney as the rights of the citizen. In every civilized country which enjoys the trial by jury, the profession is its great bulwark—a profession more honoured and more trusted, in proportion to the advance in constitutional liberty. When it falls, security and law will fall with it. A party has a right to be heard in a court of justice, and the attorney represents him. Who can say that the conclusions of the judge might not be changed or modified by the argument of the attorney, addressed to the jury? In this

case the court, in their reasons for the course they adopted, said the court would have heard the counsel as long as he pleased. But then that would have been after an opinion publicly expressed. But if they were willing to hear him as long as he pleased, why not permit him to address the jury for a reasonable time ? The true reason is probably found in the fact, that the court was determined to withdraw the evidence from the jury, and yet require them to render a verdict. Accordingly, the court say to the jury: "And that you may find no possible difficulty in finding that the plaintiff has proved his case, I do withdraw all the defendant's evidence from your consideration. This leaves you no evidence on which to found your verdict, but the plaintiff's title, and of course your verdict must be in his favour. I consider the whole responsibility of the case thrown upon the court." This summary excision of the defendant's evidence, exclusion of his counsel from a hearing, and mandate to the jury to find a verdict upon the testimony of the plaintiff alone, appears to me to have been a high exercise of authority, for which I never read any precedent in our books. We are of opinion that there was error in the proceeding. In the case of Brawdy v. Brawdy, 7 Barr, 157, which the court refer to as authority—although the case was not then reported— the Chief Justice states the true rule :—"In cases like the present, where a chancellor sends an issue to be tried by a jury, his conscience, as well as that of the jury, must be satisfied. And when his conscience is not satisfied, he may direct any number of new trials." He adds, that when our courts are giving effect to equity principles through the same medium, that is, a jury, they have the same control over the result of the evidence. Our courts, he says, cannot give judgment *non obstanti veredicto;* but rather than give judgment in conformity to it, on insufficient evidence, it would be proper to grant new trials for ever. That undoubtedly is the true remedy—a new trial—unless the party demur before verdict. The symmetry of our system is thereby preserved.

The next point on the record that requires to be resolved is, whether the parol testimony given by the defendant did establish a parol contract of sale, and such part performance by Ralph as took it out of the statute of frauds, or not. It is necessary as briefly as possible to recapitulate that testimony. [His honour here stated it.]

The contract is clearly and indisputably proved; and also that the interest of Ralph in the Bakerstown tract was the consideration in part, which Ralph had earned by long years of faithful service. Many a drop of his sweat had fallen on the land in dispute, to

enrich it for his father. Was then the other, and only other essential element to make a parol contract for the sale of land valid, present in the case? Was possession taken, and given in pursuance of the contract, and was the change of possession by some notorious act? The tenant of the Bakerstown tract attorned to the plaintiff, and acknowledged his right to the possession instead of Ralph, and paid the rent to him. It is in vain to say, as the court below do, that the legal title was in the plaintiff—the equity was in Ralph, and under the circumstances, the whole equity to an undivided moiety, the interest having been purchased for him, and principally with his money. Under this equity he entered and claimed full property and dominion, which was fully recognised and approved by plaintiff, and the law approves it. The attornment of Ralph's tenant was so notorious that the assessor of the township knew it, and assessed the land and returned it for the year 1841, in plaintiff's name. The plaintiff proposed to sell it or give it on terms to Thomas, who refused to buy, and he did sell one-half in severalty of the whole tract, and therefore put it out of his power to restore Ralph or his heirs to their former situation if the parol contract is declared null. Is it not therefore so far executed, that it would be unjust and an indirect fraud upon the heirs of Ralph to rescind it? With respect to the premises in question, on which Ralph lived at the time of the contract, there was the notorious fact as to change of possession in the only way in which it could be done. After the contract the land was taxed in the name of Ralph, which before was taxed in the name of the plaintiff. This notorious act of a public officer, shows that the sale was known to him, and this fact was manifested by the official records of the township. It must have been known to both parties, and authorized by both of them. The case cited by the court, of Brawdy *v.* Brawdy, 7 Barr, 157, is quite aside of the present; and is in my judgment rather an authority in favour of the defendant. There John sold to his brother Moses, and told his tenant that he must pay the rent to Moses. When the rent became due he offered the rent to Moses, who refused to take it, and told him to settle with John, which he did. At the end of the year the tenant left, and John entered and remained in possession. There was no change in the assessment, the land remained in the name of John as before. The Chief-Justice says, "that the evidence leaves it in doubt whether there had been an actual attornment. The uncertainty about the true state of the transaction indicates that it was intended to confound the vendor's creditors, and the court very

properly instructed that the evidence had failed to prove a case proper for the interposition of a chancellor." Here there are no creditors interfering, no uncertainty about the transaction. There is the clear attornment of the tenant of Ralph to the plaintiff, and the change of assessment, as to the Bakerstown tract. With respect to the premises in dispute, there is the public notorious act of the change of assessment in pursuance of the contract: the only change which in fact could be made. But if the change was sufficient, apparent, and notorious as to the Bakerstown tract, that was sufficient. It was a public notorious act, which would put the neighbours on their inquiry. And the sale of a moiety of the whole tract in severalty put it out of the power of the plaintiff to restore the widow and children of Ralph to the situation of the husband and father. The doctrine in McKee v. Philips, 9 Watts, 85, that what puts a party into a situation which is a fraud upon him, unless the agreement be performed, is sound to the core, and accords well with our act of 1834, which provides that the parol contract shall be valid in cases where it has been so far executed that it would be against equity to rescind the same. I refer also to the case of Brinker v. Brinker, 7 Barr, 53. This court is of opinion that this case is brought within the range of the exceptions to the statute of frauds, and within the principle adopted in our own statutes of 1818 and 1834, authorizing the specific execution of parol contracts for the sale of lands, and that the attornments, the simultaneous change of the assessments of both tracts by the officer of the township, and the sale of one-half the Bakerstown tract in severalty, were such acts of notoriety as to give the public notice of the sale, and consequent change of possession and dominion, and sufficient to rescue the case from the dominion of the statute of frauds—and that consequently the court erred in determining the reverse.

Judgment reversed, and a *venire de novo* awarded.